William L. JONES, Warden, Kentucky State Penitentiary, Appellant,

v.

Benjamin F. RAYBORN, Appellee.

Court of Appeals of Kentucky.

May 19, 1961.

John B. Breckinridge, Atty. Gen., Wayne J. Carroll, Asst. Atty. Gen., for appellant.

Benjamin F. Rayborn, pro se.

MOREMEN, Judge.

On November 20, 1946, appellee, Benjamin F. Rayborn, was sentenced to life imprisonment by the Jefferson Circuit Court for the crime of armed robbery, and on the same day he was admitted to the Kentucky State Penitentiary at Eddyville for the purpose of serving his term. On March 18, 1947, he was tried in the United States District Court for the Western District of Kentucky and there found guilty under fourteen counts of an indictment. He received the maximum sentence of five years' imprisonment on each count—some of the sentences to run concurrently and some consecutively. In all the total was thirty consecutive years. This total was later reduced to twenty years. See Rayborn v. United States, 6 Cir., 234 F.2d 368. The District Court ordered that the federal sentence be served concurrently with the state imposed sentence and that upon the expiration of the service of the state sentence, the prisoner was to be turned over to federal authorities in order to complete the federal sentence.

In June 1952 a riot occurred at the Eddyville Penitentiary and thereafter a plan developed to transfer Rayborn to the custody of the Federal Bureau of Prisons. The Director of the Federal Bureau of Prisons, James V. Bennett, requested an opinion from Kentucky authorities concerning whether the state sentence would continue to operate while Rayborn was in a federal institution. A letter was written on August 15, 1952, to W. E. Watson, then Director of the Kentucky Division of Corrections, by the office of the Attorney General of Kentucky wherein the opinion was expressed that the state sentence would run concurrently with the federal sentence, and Watson referred this letter to the federal authorities.

The record before us is not too certain as to the form or exact nature of the agreements which were reached in connection with Rayborn's transfer to federal custody on September 11, 1952, because no copies of various orders authorizing such release have been filed and we are forced to rely almost entirely upon the memory of the men who were participants. It appears to

be sufficiently shown, however, that the Director of the Division of Corrections acting under orders from the Commissioner of the Department of Welfare of this Commonwealth directed the warden of the Kentucky State Penitentiary to release Rayborn to the federal officers. The prisoner objected to this transfer and he did not enter into any agreement to return to Kentucky after he completed his term in the federal penitentiary. While it is shown by some of the letters in the record that the warden was supposed to lodge a detainer with the federal authorities, it is not definitely shown that this was done. In the absence of any papers or copies of papers or other proof which definitely show the manner in which Rayborn was turned over to the federal authorities, we will presume that it was validly and properly done under the law.

At the time of his surrender to federal officers, Rayborn had served 5 years, 9 months and 21 days in the state prison. A prisoner serving a life term is eligible for parole after serving eight years, KRS 439.110. If Rayborn had remained in the Kentucky prison he would have served eight years by November 1954.

After Rayborn was turned over to federal custody, as stated above, his sentence was reduced from thirty to twenty years. In addition, while serving in the United States Penitentiaries at Alcatraz Island, California and at Atlanta, Georgia, his conduct was such that he accumulated 2706 days' deduction from his sentence for good behavior and, on October 20, 1959, he became eligible for parole on his federal sentence.

Prior to that date, on August 25, 1959, in response to a request from the Director of the Division of Corrections, Department of Welfare, the Attorney General of this Commonwealth rendered another opinion in which he set forth that Rayborn must serve a minimum of eight years in a penal institution in this state under the control of the prison authorities of this state before he was eligible for parole consideration and that it was beyond the power or discretion of state authorities to allow time spent in a federal prison to apply in arriving at the minimum of eight years which is necessary before a prisoner is eligible for parole under a life sentence, the effect in application being that no portion of the state sentence for life ran during the 7 years and 2 months' confinement in the federal penitentiaries and that Rayborn must serve approximately 2 years and 2 months in the state penitentiary to complete the eight years necessary.

Upon Rayborn's release from the federal prison he was arrested as a fugitive and returned to Eddyville.

On March 17, 1961, the Lyons Circuit Court granted a petition for a writ of habeas corpus on the ground that the transfer of Rayborn to the federal authorities in September 1952 resulted in a waiver of jurisdiction by the Commonwealth.

The Commonwealth has appealed under § 429a–1 of the Criminal Code of Practice.

At the time Rayborn was transferred to Eddyville he was not paroled nor was he eligible for parole under subsection (3) of KRS 439.110. He was in custody under his conviction at the time he was surrendered to the federal authorities. As pointed out in the annotation, 147 A.L.R. 943, different questions arise when there is a surrender of a convict to authorities of another jurisdiction when the: (1) Convict is in custody; (2) convict is at liberty; (3) convict has been paroled. We are concerned, of course, with the first item.

People ex rel. Barrett v. Bartley, 383 Ill. 437, 50 N.E.2d 517, 521, 147 A.L.R. 935, is authority for the proposition that when a state honors the request of another state for the extradition of a convict who is serving a prison sentence without stipulation for his return, it thereby relinquishes jurisdiction to subject him to further punishment. In that case the convict was confined in the penitentiary at Joliet, Illinois,

for the crime of uttering a forged check. On April 20, 1936, without an application for a parole from the convict, the parole board in an ex parte proceeding on its part paroled him for the period of his term, the parole to become effective on May 16, 1936. On May 15, before the effective date of the parole, the Governor of Illinois honored a requisition from the State of Wisconsin and an extradition warrant authorizing his arrest and detention was issued. On May 16 he was delivered to the agent of the State of Wisconsin. He was there tried, convicted and served a term in the penitentiary until September 27, 1937. Upon his release he went to Ohio where he was again convicted, served a sentence and was released about June 24, 1940. While in Ohio the State of Illinois placed a detainer request with the prison authorities of Ohio. Extradition proceedings were instituted and he was returned to Illinois. He filed a petition for a writ of habeas corpus. The appellate court being of the opinion that the original parole to become effective May 16, 1936, was a conditional one, since he was never released, but simply transferred to the Wisconsin authorities, concluded he should be treated as if he were still in custody on that day. It was pointed out that had he been extradited while absent from the prison and on parole, quite a different question would have been presented.

The court said:

"Other cases adopting the principle of law that where a prisoner serving a sentence is extradited as a fugitive from justice and delivered to another State, jurisdiction over his person is forever waived by the asylum State are: In re Whittington, 34 Cal.App. 344, 167 P. 404; State v. Saunders, 288 Mo. 640, 232 S.W. 973; Jones v. Morrow, 154 Kan. 589, 121 P.2d 219. The legal effect and logic of these cases convince us that the waiver of jurisdiction of a State over a fugitive is a prerogative of the Governor, and that, his extradition warrant takes priority over all State process by which the fugitive is held; that a prisoner cannot be handed from one jurisdiction to another for the purpose of trial, conviction and service of a new sentence, before being returned to the asylum State for service of the unexpired sentence, without violating his constitutional rights.

"We believe the action of the Governor, in the exercise of his constitutional powers in extraditing relator while he was in the service of a sentence from the Winnebago county circuit court, operated to waive any further jurisdiction over the person of the prisoner and that the circuit court of Will county correctly granted the writ in the habeas corpus proceeding in Will county and in discharging the prisoner."

In the later case of People ex rel. Milburn v. Nierstheimer, 401 Ill. 465, 82 N.E.2d 438, where state authorities delivered the convict to federal authorities under the action of the parole board and where the convict signed a form of parole agreement wherein it was recited that he was temporarily and conditionally turned over to the U. S. Marshall, the court reaffirmed the principles announced in the Bartley case, but held that a waiver of jurisdiction results only if the delivery to the federal authorities is made upon a warrant of extradition issued by the Governor. This was not done and the writ was denied.

In behalf of appellant, Jones, Warden of Kentucky State Penitentiary, it is pointed out that in the above cases it was the act of the Governor in extraditing a prisoner who was serving a sentence within his state which waived further jurisdiction over the convict—the implication being that he had exercised his personal right granted by most state constitutions to their Governors to pardon or commute sentences. This argument is supported by the case of People ex rel. Milburn v. Nierstheimer, 401 Ill. 465, 82 N.E.2d 438, above discussed, and People ex rel. Pring v. Robinson, 409 Ill.

105, 98 N.E.2d 119, although the facts in neither of the cases are the same as those here involved. (In each case the prisoner signed a parole agreement and the board had granted the parole.)

Appellant contends under § 77 of our Constitution, which reads in part, "He shall have power to remit .fines and forfeitures, commute sentences, grant reprieves and pardons, except in case of impeachment * * *," the right to pardon or commute sentence is given to the Governor alone and not to lesser officials.

We have difficulty in accepting this theory. The big question seems to be: Can the state through any of its officers by its acts waive a right which belongs to it? All the cases assume that it can. A waiver, as we all know, is the "voluntary surrender of a known right." There must be "a clear, unequivocal and decisive act of the party showing an intention to relinquish the right." Yet all the cases which we have read have assumed that the state is subject to the application of the "waiver" doctrine. If that supposition is correct— and we believe it is—why is so much stress laid on the fact that the Governor did not act but that only the parole board acted? In the Milburn case and in the Pring case it was indicated that if the Governor had acted the result would have been the converse, and the ruling in People ex rel. Barrett v. Bartley, 383 Ill. 437, 50 N.E.2d 517, 147 A.L.R. 935, would control. But in the Barrett case the Governor was not attempting to exercise his right to pardon or to commute—clearly, unequivocally or decisively. He was trying to do something entirely different. (His parole board, without application from the convict, granted a parole effective May 16. On May 15, he issued a warrant authorizing the prisoner's extradition to Wisconsin for trial on another accusation.) Nevertheless, it was held the State of Illinois had waived its right further to detain the prisoner—not that the Governor had exercised his right to pardon or commute a sentence. That right was not involved. This case, and

others which we will discuss later, seem to be dedicated to the idea that a sovereign should be subjected to the same standards of fair play as are required of other entities or persons. Therefore, it appears unreasonable to limit the application of these standards to the Governor alone. He is not the State. He is the Chief Executive, but the State may act in many capacities through lesser officials and in turn the acts of many officials other than the Governor may bind the State. And if the Governor may waive a right of the State when he is not attempting to exercise his right to pardon and is acting in another field, we see no reason why other officials of the State should not also bind the State by their official acts.

We suppose the due process clause of the 14th Amendment to the Federal Constitution is designed to shield litigants against arbitrary action in disregard of essential right and justice, Rau v. McCorkle, 45 N.J.Super. 191, 131 A.2d 895. It is hard to conceive of a case where a person's rights under the law were treated more cavalierly than in this one.

Some of the cases similar but never the same in fact to the one we have here and where the doctrine of waiver was applied— usually because the governor acted—are: In re Whittington, 34 Cal.App. 344, 167 P. 404; State v. Saunders, 288 Mo. 640, 232 S.W. 973; Jones v. Morrow, 154 Kan. 589, 121 P.2d 219; Ex parte Guy, 41 Okl. Cr. 1, 269 P. 782. However, it must be emphasized that no case we have found is exactly the same in fact as this one. Let us remember again that at the time Rayborn was surrendered to federal authorities he had not applied for parole and was not eligible for one. He was forcefully removed from Kentucky under the impression that he would serve 24 years in the federal penitentiary unless paroled. At the time he was returned to the Kentucky prison he was not wanted for prosecution for any crime. He was not a fugitive from justice or subject to return under KRS 440.090. He was not a parole violator subject to re-

imprisonment under KRS 439.190. He was not an escaped convict subject to be returned under KRS 440.010, or 440.030.

It is alleged, in effect, in the petition for a writ of habeas corpus that he was reimprisoned under a fugitive from justice warrant and no denial of that fact was made by respondents; to the contrary, no traverse of any allegation of the petition was made in behalf of appellant who merely stated in response that the petition was a collateral attack upon the judgment and raised only the question of whether the judgment was void; and further that since the judgment was not void, it was not subject to collateral attack. We believe his present commitment under a fugitive warrant resulted from improper extradition, because he was not a fugitive from justice.

A fugitive from justice is usually one who with knowledge that he is being sought pursuant to court process, absents himself or flees from a state where he is charged with the commission of a crime. Tobin v. Casaus, 128 Cal.App.2d 588, 275, P.2d 792, 49 A.L.R.2d 1419; Ex parte Arrington, Mo., 270 S.W.2d 39; or as defined in 35 C.J.S. Extradition § 10, page 391:

"A fugitive from justice, in the law of extradition, is one who, having committed or been charged with a crime in one state, has left its jurisdiction, and is found within the territory of another when it is sought to subject him to the criminal process of the former state."

The facts of this case force us to the conclusion that the manner and methods employed in handling Rayborn should not be tolerated. He was transferred to another prison beyond the jurisdiction of this State, apparently to serve the remainder of his term in a prison not authorized for such service by our statutes, against his will, and without agreement. By use of a detainer he was restrained after he had served time which would have made him eligible for parole under Kentucky law.

Such practice has been severely condemned by the Interstate Commission on Crime. See Ex parte Drake, Cal.App., 233 P.2d 931. He was returned to Kentucky under an instrument which has no basis in law or in fact.

We believe this case might well be decided entirely under the poetic but rarely applied § 2 of the Constitution of the Commonwealth of Kentucky where it is written:

"Absolute and arbitrary power over the lives, liberty and property of free men exists nowhere in a republic, not even in the largest majority."

We believe the judgment of the circuit court was correct and it is therefore affirmed.

WILLIAMS, J., not sitting.