COMMONWEALTH of Kentucky, Appellant,

v.

Edsel Eugene HALE, Jr., Appellee.

No. 1999–SC–0120–DG.

Supreme Court of Kentucky.

Jan. 23, 2003.

---

**1.** Ky., 23 S.W.3d 615 (2000).

**2.** *Id.* at 618–619 (Cooper, J., dissenting).

**3.** *Id.* at 618.

**4.** *See Kentucky Labor Cabinet v. Graham*, Ky., 43 S.W.3d 247, 251 (2001).

A.B. Chandler, III, Attorney General, Perry T. Ryan, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, for Appellant.

Kathryn G. Wood, Somerset, for Appellee.

Opinion of the Court by Justice
KELLER.

## I. INTRODUCTION

While in Kentucky on work release from a federal prison sentence, Appellee committed and was convicted of a Kentucky felony offense for which the Pulaski Circuit Court sentenced him to serve four (4)

years in the custody of the Kentucky Department of Corrections. Following Appellee's final sentencing for the Kentucky conviction, Pulaski County Detention Center ("PCDC") employees, acting without authorization, delivered Appellee into the custody of federal authorities who subsequently transported Appellee to a federal prison to recommence service of his federal sentence. Approximately seven (7) years later, the federal authorities released Appellee to a Kentucky detainer for service of the Kentucky sentence imposed by the Pulaski Circuit Court. While incarcerated at a Kentucky Correctional Facility in Laurel County, Kentucky, Appellee filed a habeas corpus action alleging that his imprisonment was unlawful and that he was entitled to immediate release from the Pulaski Circuit Court sentence because the Commonwealth of Kentucky, by relinquishing its custody of Appellee to federal authorities, had forfeited its right to enforce the Pulaski Circuit Court sentence. Relying upon a "Forfeiture of Sentence Rule" ("forfeiture rule") announced in *Jones v. Rayborn*[1] and further defined in its progeny, both the Laurel Circuit Court and the Kentucky Court of Appeals held that Appellee was entitled to a writ of habeas corpus. On the Commonwealth's motion, we granted discretionary review to reexamine the forfeiture rule. We conclude that this "rule"—which is not compelled by any federal or state constitutional provision, and, in fact, lacks any identifiable underlying principle consistent with its past application—is simply an antiquated, judicially-created policy, and, because we can discern no persuasive reason to continue the policy, we now abandon it. We therefore hold that the Commonwealth of Kentucky did not forfeit its right to enforce Appellee's sentence when its agents improperly relinquished custody of

Appellee to federal authorities, and we thus reverse the decision of the Court of Appeals and remand this case to the trial court for it to enter an order denying Appellee's petition.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The matter now before the Court began with Appellee's filing of a Petition for a Writ of Habeas Corpus alleging that his present imprisonment was unlawful and that he was entitled to immediate release from service of the sentence imposed by the Pulaski Circuit Court. In his affidavit, Appellee made no allegation that the Commonwealth or its agents had, through deliberately oppressive actions, violated his substantive due process rights, and instead alleged only that Kentucky had "forfeited jurisdiction and custody over [him] as it relates to further service of the Pulaski County sentence" by "violat[ing] statutory procedures when [PCDC employees] released him to the jurisdiction of the federal authorities."

In its order granting habeas relief, the trial court made findings of fact as to the nature of Appellee's confinement, and these findings, which we find supported by substantial evidence, adequately outline the factual and procedural background to this case:

1.    The Petitioner received a federal sentence of twenty-four (24) years on August 15, 1979.

2.    On or about June 2, 1987, the Petitioner was transferred by the federal authorities to the Big John Bowling House in East Bernstadt, Kentucky, and was permitted to participate in the Work Release Program.

---

1. Ky., 346 S.W.2d 743 (1961).

3. While out on work release, Petitioner was arrested in Pulaski County, Kentucky, on or about August 21, 1987, for the charges of Theft by Unlawful Taking over $100 in violation of KRS 514.030, and lodged in the Pulaski County Detention Center.

4. On or about August 21, 1987, while Petitioner remained incarcerated in the Pulaski County Detention Center, a Detainer was lodged against the Petitioner by the Federal Authorities so that Petitioner would be returned to Federal Custody upon completion of the pending Pulaski County action and any sentence he may receive therefrom.

5. The Petitioner remained in the custody of Pulaski County pursuant to these charges and a plea of guilty to Theft by Unlawful Taking was entered on January 20, 1988, whereby it was Ordered that Petitioner be sentenced to imprisonment for a period of four (4) years. Additionally, the Pulaski Circuit Court noted that the recommendation of the Commonwealth was a sentence of imprisonment for a term of four (4) years to run consecutively with any other sentence he had received.

6. Although there had been a detainer lodged against the Petitioner by the Federal Authorities, there was never any request for custody of the Petitioner pursuant to KRS 440.450–440.510, Kentucky's Interstate Agreement on Detainers Act, nor was there any action taken in accordance with KRS 440.150–444.420, Kentucky's Uniform Criminal Extradition Act.

7. On January 20, 1988, after Petitioner had entered a plea of guilty before the Pulaski Circuit Court he was taken back to the Pulaski County Detention Center, whereby he was then delivered by officials at the Detention Center into the custody of the Federal Authorities.

[8.] Although there had been a detainer lodged against the Petitioner by the Federal Authorities, there was never any request for custody of the Petitioner pursuant to KRS 440.450–440.510, Kentucky's Interstate Agreement on Detainers Act, nor was there any action taken in accordance with KRS 440.150–440.420, Kentucky's Uniform Criminal Extradition Act.

[9.] On or about May 25, 1988, Pulaski County placed a detainer on the Petitioner with the Federal Authorities so that Petitioner would be placed in the custody of Pulaski County upon his release from federal custody for execution of the four (4) year sentence obtained by Pulaski County.

[10.] On October 27, 1995, Petitioner was released from the custody of the federal authorities in Manchester, Kentucky into the custody of Pulaski County for service of the Pulaski County sentence.

[11.] Since October 27, 1995, Petitioner has been incarcerated pursuant to the Pulaski County sentence.

[12.] On October 9, 1997, the date on which his Petition for Habeas Corpus was filed, Petitioner was incarcerated in Laurel County Detention Center pursuant to the four (4) year sentence imposed in Pulaski County.

After analyzing these factual findings in light of Kentucky case law, the trial court found two (2) separate and independent bases to support the conclusion that Appellant was "being detained without lawful authority,"[2] and therefore entitled to the relief he sought. First, the trial court concluded that, because there was no statutory authorization for PCDC employees to transfer custody of Appellee to the federal authorities, the transfer was illegal and, under Kentucky precedent, therefore "forfeited Kentucky's right to enforce the execution and to insist upon the Petitioner's completion of his sentence[.]" However, the trial court also concluded that "the four (4) year sentence imposed by the Pulaski Circuit Court in Indictment Number 87–CR–110–3 was to have run concurrently with the federal sentence the Petitioner was then already serving" and thus reasoned that Appellee's Pulaski County sentence "was completed when he was released from the custody of the Federal Institution ... [and] [h]e should not have been reincarcerated on the Pulaski County sentence." Accordingly, the trial court issued a writ of habeas corpus directing that Appellee "shall be immediately released from being incarcerated pursuant to the Pulaski County Sentence."

The Commonwealth then appealed the trial court's order, and the Court of Appeals separately addressed the trial court's alternative grounds for granting the writ. First, the panel held that Appellant's Pulaski Circuit Court sentence ran consecutive to his federal sentence, and thus rejected the fundamental premise of the trial court's conclusion that Appellee's continued incarceration under a fully-exhausted Pulaski Circuit Court sentence was unlawful. As to the forfeiture rule theory, however, the Court of Appeals held that, because it had no authority to "either reverse or modify" existing Kentucky precedent, it was "compelled to affirm" the trial court's issuance of the writ. The panel, however, encouraged this Court to reexamine the forfeiture rule and expressed its belief that the applicable Kentucky precedent has mistaken the nature of the federal-state relationship with regard to criminal jurisdiction:

> We would be remiss if we did not point out the problem we have with *Jones* and *Davis*. In both cases, Kentucky's highest court applied extradition principles to a transfer from state to federal authorities when such a transfer is not actually an extradition. In both *Jones* and *Davis,* as here, the jurisdictions involved are overlapping. Yet, the authorities relied on by the Court in those cases involved a state-to-state extradition and jurisdictions that are separate and equal. It seems to us that neither local officials nor the Governor has any discretion to decline the transfer. When a federal marshal serves an arrest warrant the person named must be turned over without delay. Furthermore, in *Davis* the Court relied on KRS 440.330 for part of its rationale, ignoring the fact that the United States Government is not a signatory to the Uniform Criminal Extradition Act, KRS 440.150 to 440.420. None of the provisions of the Uniform Criminal Extradition Act, including KRS 440.330, have any application to a transfer of a prisoner from state to federal authorities. We hope that the Supreme Court of Kentucky will take another look at the forfeiture of jurisdiction problem.

We granted the Commonwealth's motion for discretionary review in which it had designated one (1) question of law, "Whether the Kentucky Courts Should

2. KRS 419.020.

Overrule the Forfeiture of Sentence Rule[.]" Appellee did not file a CR 76.21 Cross–Motion for Discretionary Review designating any additional issues for our consideration,[3] and thus the sole issue before the Court is whether the Commonwealth lost its right to incarcerate Appellee when Appellee was transferred to federal custody in an unauthorized manner. In analyzing this issue, we will first examine Kentucky's past applications of this forfeiture rule and then determine whether the custody transfer in this case falls within the scope of the rule. Finally, we will examine the theoretical bases this Court has identified for Kentucky's forfeiture rule in order to assess whether the rule continues to serve a valid purpose forty (40) years after its creation.

### III.  ANALYSIS

### A.  *JONES v. RAYBORN* AND ITS PROGENY: THE FORFEITURE RULE IN PRACTICE

Kentucky courts first applied a forfeiture of sentence rule in 1961, when our predecessor rendered *Jones v. Rayborn.*[4] In that case: (1) Rayborn, the inmate seeking habeas corpus relief, had first received, and began serving, a life sentence in Kentucky, and a year later received a concurrent twenty (20) year sentence in federal court; (2) less than six (6) years into—and slightly more than two (2) years before he was eligible for parole from—

the Kentucky life sentence, "the Director of the Division of Corrections acting under orders from the Commissioner of the Department of Welfare of this Commonwealth directed the warden of the Kentucky State Penitentiary to release Rayborn to ... federal officers"[5] without Rayborn's consent;[6] (3) Rayborn then served approximately seven (7) years in United States Penitentiaries in other states before he became eligible for, and was granted, parole from his federal sentence; (4) Rayborn attempted to fight his return to Kentucky,[7] but was nonetheless arrested as a fugitive and returned to the Kentucky State Penitentiary; (5) where under an opinion rendered by Kentucky's Attorney General approximately two (2) months before Rayborn was released from federal custody, Rayborn would now have to serve two (2) years and two (2) months before he would become eligible for parole from his life sentence in Kentucky.

Upon Rayborn's petition, the circuit court granted a writ of habeas corpus "on the ground that the transfer of Rayborn to the federal authorities in September 1952 resulted in a waiver of jurisdiction by the Commonwealth."[8] On appeal, our predecessor court affirmed, and in its opinion: (1) invoked state and constitutional due process protections and took the Commonwealth to task for its "arbitrary actions" and "cavalier treatment" of Rayborn;[9] (2) relied heavily upon an Illinois case, *People*

---

3.  *See Commonwealth Transp. Cabinet Dep't of Highways v. Taub,* Ky., 766 S.W.2d 49, 51–52 (1988); *Green River Dist. Health Dep't v. Wigginton,* Ky., 764 S.W.2d 475, 479 (1989) ("[T]he prevailing party in the Court of Appeals must follow [the CR 76.21] procedure if he wishes our Court to further review other issues in addition to those raised in the Motion for Discretionary Review."), *overruled on other grounds, Withers v. University of Kentucky,* Ky., 939 S.W.2d 340 (1997).

4.  *Supra* note 1.

5.  *Id.* at 745.

6.  *See Rayborn v. Swope,* 215 F.2d 604 (9th Cir.1954).

7.  *See Rayborn v. Jones,* 282 F.2d 410 (6th Cir.1960).

8.  *Jones v. Rayborn, supra* note 1 at 745.

9.  *Id.* at 747.

*ex rel. Barrett v. Bartley,*[10] as support "for the proposition that when a state honors the request of another state for the extradition of a convict who is serving a prison sentence without stipulation for his return, it thereby relinquishes jurisdiction to subject him to further punishment";[11] and (3) found fault with the fact that Appellant was returned to Kentucky custody pursuant to a fugitive warrant.[12]

Just one year after *Jones v. Rayborn,* our predecessor applied the forfeiture rule in two more cases. In *Davis v. Harris,*[13] the Court held that Kentucky had forfeited its right to incarcerate an inmate when Kentucky officials, acting arbitrarily without either consent or statutory authority for their actions, held the inmate in local custody until he was tried and convicted of a federal offense and then released him to federal authorities to serve his federal sentence instead of delivering him to the custody of the Department of Corrections to commence service of his Kentucky sen-

tence.[14] And, in *Thomas v. Schumaker,*[15] the Court invoked the forfeiture rule when Kentucky "parol[ed] . . . a convict to the authorities of another jurisdiction for trial upon a criminal charge[.]"[16] These three cases—*Jones, Davis,* and *Thomas*—are the foundation of Kentucky's forfeiture rule jurisprudence and stand for the general proposition "that the state forfeits its jurisdiction when local authorities release a prisoner to another state without following proper administrative or statutory procedures."[17]

Thus, the primary issues involved in subsequent cases addressing Kentucky's forfeiture rule concerned either the process by which an inmate was released to another sovereign or the nature of the confinement from which the inmate was released. And, because in the *Jones, Davis,* and *Thomas* trinity, "[i]t was the unauthorized manner and method of Kentucky's surrender of the prisoner to anoth-

10. 383 Ill. 437, 50 N.E.2d 517 (1943).

11. *Jones v. Rayborn, supra* note 1 at 745.

12. *Id.* at 748 ("We believe his present commitment under a fugitive warrant resulted from improper extradition, because he was not a fugitive from justice.").

13. Ky., 355 S.W.2d 147 (1962).

14. *Id.* at 148.

15. Ky., 360 S.W.2d 215 (1962).

16. *Id.* at 215. *But see Baldridge v. Commonwealth,* Ky., 473 S.W.2d 847 (1971) (reaching the opposite result when a similar action was taken at the direction of the Governor in accordance with KRS 440.330).

17. *Shull v. Wingo,* Ky., 446 S.W.2d 645, 646 (1969). *See also Davis v. Harris, supra* note 13 at 148 ("The evil in this and the Rayborn case is not so much what was done, but that it was done without authority."); *Brewster v.*

*Luby,* Ky., 380 S.W.2d 261, 262 (1964) ("It was the unauthorized manner and method of Kentucky's surrender of the prisoner to another sovereign which was determinative in [*Jones, Davis,* and *Thomas*]."); *Turner v. Thomas,* Ky., 383 S.W.2d 379 (1964) ("[*Jones, Davis,* and *Thomas*] all were cases in which physical custody of the prisoner was given over to another jurisdiction without statutory or other regulatory authority for the procedure."); *Balsley v. Commonwealth,* Ky., 428 S.W.2d 614, 615–6 (1968) ("In [*Davis* and *Thomas*] we held that the transfer of custody without statutory authority constituted arbitrary treatment barring further enforcement of the sentence under which the prisoner was being held by this state at the time of the transfer."); *Commonwealth v. Hayes,* Ky., 734 S.W.2d 467, 471 (1987) ("*Balsley, Thomas,* and *Davis* stand for the proposition that an unauthorized release to a foreign jurisdiction, that is, the transfer of custody without statutory authority, constitutes 'arbitrary treatment barring further enforcement of the sentence under which the prisoner was being held by this state at the time of the transfer.' " *quoting Balsley v. Commonwealth, supra*).

er sovereign which was determinative," [18] the Court has declined to apply the forfeiture rule in cases where the cross-jurisdictional custody transfer occurred under the aegis of statutory authority, e.g., when Kentucky: (1) authorized another state to supervise a Kentucky convict's parole under the Uniform Act; [19] (2) returned another state's parolee pursuant to an Interstate Compact; [20] (3) properly extradited a defendant under the statutory provisions of the Uniform Criminal Extradition Act ("UCEA"); [21] or (4) temporarily surrendered custody over the defendant under the Interstate Agreement on Detainers ("IAD"). [22] Nor have we applied the rule in cases where the Commonwealth of Kentucky has not actually delivered custody to another sovereign, e.g., when another sovereign obtains custody of a Kentucky probationer by arresting him after a Kentucky court ordered his release, [23] or when custody is obtained not from Kentucky, but from a third-party asylum state. [24]

Further, we have applied the forfeiture rule to a narrow class of "prisoners"—i.e., inmates in the Commonwealth's actual custody who were, at the time of the unauthorized custody transfer, serving the sentence for which forfeiture is sought. Accordingly, we have found habeas relief unavailable in cases where: (1) the defendant is released from "pre-conviction custody" in Kentucky to another sovereign and later returned to Kentucky, convicted, and sentenced; [25] or (2) the defendant was surrendered to another sovereign while incarcerated for an offense separate from the offense for which forfeiture is sought. [26] And, we have also held that the rule will not require forfeiture of a capital sentence [27] or of a fine unaccompanied by a term of imprisonment. [28]

Finally, this Court and its predecessor have limited the application of the forfeiture rule to Kentucky convictions, and, in cases where defendants have sought habeas relief from their detention under extradition warrants, we have declined to decide whether another state forfeited its right to execute a criminal sentence when it trans-

**18.** *Brewster v. Luby, supra* note 17 at 262.

**19.** *See Turner v. Thomas, supra* note 17.

**20.** *See Shull v. Wingo, supra* note 17 at 646.

**21.** *See Zitt v. Wingo,* Ky., 467 S.W.2d 370, 371 (1971). In fact, the UCEA contains an express anti-forfeiture clause. KRS 440.330 ("[H]owever, in no case shall surrender of such prisoner be construed as a complete relinquishment of jurisdiction by this state, but such prisoner shall forthwith be returned to the custody of this state . . . .").

**22.** *See Gall v. Commonwealth,* Ky., 702 S.W.2d 37, 44 (1986).

**23.** *See Herndon v. Wingo,* Ky., 404 S.W.2d 453 (1966)

**24.** *See Chick v. Commonwealth,* Ky., 405 S.W.2d 14 (1966).

**25.** *See Prather v. Commonwealth,* Ky., 368 S.W.2d 175 (1963); *Simpson v. Black,* Ky., 471 S.W.2d 739 (1971); *Lynch v. Commonwealth,* Ky., 472 S.W.2d 263 (1971).

**26.** *See Baker v. Commonwealth,* Ky., 378 S.W.2d 616 (1964); *Messamore v. Wingo,* Ky., 408 S.W.2d 448 (1966). *But see Balsley v. Commonwealth, supra* note 17.

**27.** *See Gall v. Commonwealth, supra* note 22 at 44 ("The jury returned a death sentence for Gall, and therefore, the rationale underlying these cases [*Jones, Davis, Thomas,* and *Balsley*] is inapplicable to him.")

**28.** *See Commonwealth v. Hayes, supra* note 17 at 471 ("[T]he threshold factor before a prisoner can question an obligation to serve out the remainder of his sentence is proof that he has commenced serving out that sentence and his service has then been interrupted in an unauthorized manner. None of this relates to payment of the fine in this case.").

ferred custody of the defendant to another sovereign.[29]

## B. LEGALITY OF CUSTODY TRANSFER IN CASE AT BAR

■ Because we have held that the forfeiture rule is implicated only when an *unauthorized* custody transfer takes place, the Commonwealth follows the lead of the Court of Appeals and argues that our existing precedent has erroneously equated a transfer of custody between Kentucky and federal authorities with the extradition process implicated in a state-to-state custody transfer. Accordingly, the Commonwealth argues that language in both *Davis v. Harris* and *Balsley v. Commonwealth* to the effect that the federal government can obtain custody of an inmate incarcerated by Kentucky only under the UCEA[30] is misguided because: (1) the federal government is not a party to the UCEA; and (2) it is not a party for a good reason—an inmate incarcerated in a Kentucky prison remains within the territorial jurisdiction of the United States and thus "extradition" is unnecessary. Although we agree with each of these premises and with the Commonwealth's observation that, in the past,

we have erroneously suggested that the UCEA is the proper means to transfer custody of an inmate between the Commonwealth of Kentucky and the federal government, we disagree with the conclusion drawn by the Commonwealth.

■ The Commonwealth has cited us no authority to support its contention that the Supremacy Clause of the United States Constitution[31] not only authorizes, but actually requires, Kentucky to surrender custody of an inmate to federal authorities bearing valid federal process. And, in fact, the authority we have located is directly to the contrary because, as the United States Supreme Court held in *Covell v. Heyman*,[32] state and federal courts exercise the authority of separate sovereigns:

> These courts [federal and state] do not belong to the same system, so far as their jurisdiction is concurrent; and although they co-exist in the same space, they are independent, and have no common superior. They exercise jurisdiction, it is true, within the same territory, but not in the same plane; and when one takes into its jurisdiction a specific thing, that res is as much withdrawn

---

**29.** *See Crady v. Cranfill*, Ky., 371 S.W.2d 640, 644 (1963) ("[T]he privilege of determining whether South Carolina has lost [the right to enforce the sentences imposed] should rest exclusively with the courts of that state."); *Brewster v. Luby, supra* note 17 at 262 ("[I]t would be inappropriate and contrary to sound policy for the courts of this state to assume jurisdiction to determine whether the demanding jurisdiction (Michigan here) has forfeited its right to enforce its laws against the petitioner."); *Wright v. Renaker*, Ky., 387 S.W.2d 588, 589 (1965) ("[S]hall the courts of Kentucky or Tennessee determine this matter? The answer to this question ... is found in *Crady v. Cranfill*...." (citation omitted)); *Nolan v. Cowan*, Ky., 501 S.W.2d 586, 588 (1973) ("[I]t is not the policy of this court to declare the effect of such a violation under the laws of another state.").

**30.** *See Davis v. Harris, supra* note 13 at 148 ("Given a liberal and practical construction, as we believe it should have, this statute [KRS 440.330] is broad enough to authorize a transfer by the Governor of this state on request of the Attorney General of the United States or his duly authorized representative."); *Balsley v. Commonwealth, supra* note 17 at 616 ("[I]f the statute [KRS 440.330] does not apply then there is, of course, no authority whatever under which a prisoner of this state could be released conditionally for trial on a federal offense.").

**31.** U.S. CONST. art. I, § 2, cl. 2.

**32.** 111 U.S. 176, 4 S.Ct. 355, 28 L.Ed. 390 (1884).

from the judicial power of the other, as if it had been carried physically into a different territorial sovereignty. To attempt to seize it by a foreign process is futile and void.[33]

In order to "preserve[ ] our two systems of courts from actual conflict of jurisdiction,"[34] the United States Supreme Court has held that either sovereign—federal or state—has the right to exclusive custody of a prisoner who has been convicted of violating the laws of that sovereign and is "permitted to exhaust its remedy ... before the other court shall attempt to take it for its purpose."[35] Accordingly, when the Commonwealth of Kentucky took custody of Appellee for a violation of our Penal Code, it had a right as a separate sovereign to require Appellee to serve the entirety of his four (4) year sentence before it relinquished custody. And thus, even if the PCDC records demonstrated

that Appellee was released to the federal authorities holding a federal arrest warrant—and they do not[36]—no notion of "federal supremacy" would have authorized the transfer of custody.

■ When an individual has violated the criminal laws of more than one jurisdiction, a sovereign may, however, at its sole discretion, elect to waive its right to "*exclusive* custody ... in order that the other may also subject him to conviction of crime against it."[37] And, while the *Balsley* Court correctly observed in 1968 that no Kentucky statute—except, in its view, the UCEA[38]—authorized Kentucky to surrender a prisoner to federal authorities for trial, the Kentucky General Assembly has subsequently enacted the provisions of the IAD,[39] to which the United States Government *is* a party. The IAD authorizes temporary custody transfers for exactly that

---

**33.** *Id.* at 111 U.S. 176, 182, 4 S.Ct. 355, 358, 28 L.Ed. 390, 393. *Cf. Ableman v. Booth*, 62 U.S. 506, 516, 21 How. 506, 516, 16 L.Ed. 169, 173 (1858):

> [T]he powers of the General Government, and of the State, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. And the sphere of action appropriated to the United States is as far beyond the reach of the judicial process issued by a State judge or a State court, as if the line of division was traced by landmarks and monuments visible to the eye.

*Id.*

**34.** *Ponzi v. Fessenden*, 258 U.S. 254, 260, 42 S.Ct. 309, 310, 66 L.Ed. 607, 611 (1922).

**35.** *Id.*

**36.** In fact the certified PCDC custody documents that Appellee submitted to the trial court contain no information regarding the circumstances under which Appellee was released to the federal authorities despite the fact that administrative regulations require that before they release a prisoner, jail offi-

cials must: (1) receive written legal authorization for the release; (2) verify the identity of the receiving authority; (3) keep a written record "of the time, purpose, date, and authority for release or removal from confinement, and into whose custody the prisoner is released or removed"; (4) obtain the receiving authority's signature on an authorized release form; and (5) "consult with the appropriate prosecutorial office in the county" before releasing the prisoner to a out-of-state jurisdiction. *See* 501 KAR 10:120(5).

**37.** *Ponzi v. Fessenden*, *supra* note 34 at 258 U.S. 254, 260, 42 S.Ct. 309, 310, 66 L.Ed. 607, 611 (emphasis added). But, a sovereign's right of exclusive custody gives an inmate no right to direct the manner in which he serves sentences owed to separate sovereigns, and instead merely "gives the ... sovereign the right, under the law of comity to object to the interference of its jurisdiction of the person of the accused until it has exhausted its remedy against him." *Rawls v. United States*, 166 F.2d 532 (10th Cir.1948).

**38.** KRS 440.150—440.420.

**39.** KRS 440.450—440.510.

purpose.[40]

█ In the case at bar, however, Appellee was not transferred to federal custody under the provisions of the IAD. Nor was the custody transfer accomplished for the purpose of permitting a trial on a pending indictment. Instead, the federal authorities took custody of Appellee so that he could recommence service of an already-imposed federal prison sentence. The Commonwealth has not cited us to any statute that authorized it to release Appellee to federal authorities under those terms, and we thus conclude that the surrender of custody that occurred in this case would, under existing precedent, mandate forfeiture of Appellee's four (4) year prison sentence imposed by the Pulaski Circuit Court. Thus, we squarely face the issue upon which we accepted discretionary review and must decide whether we should overrule existing precedent and discard the forfeiture rule.

## C. THE FORFEITURE RULE IN THEORY: UNDERPINNINGS AND OBSOLESCENCE

The underlying theoretical basis for the forfeiture rule applied by Kentucky courts is nothing if not murky. At the forfeiture rule's genesis in *Jones v. Rayborn*, the Court suggested all of the following: (1) an unauthorized transfer of custody constituted a relinquishment of jurisdiction akin

to a pardon or a commutation of sentence [41]—and, in the process of so holding, the Court deprived that explanation of any possible normative consistency by: (a) identifying an analytical flaw in the articulation for this explanation and using that flaw to justify some alternative (and unspecified) articulation of this "waiver" explanation; [42] and (b) sidestepping the fact that the same court that had rendered the primary authority upon which the *Jones* Court relied later explicitly declined to apply the forfeiture rule to an unauthorized release of custody; [43] (2) transferring Rayborn to federal custody—and/or perhaps returning him *from* federal custody—constituted arbitrary action that violated Rayborn's rights under the 14th Amendment of the United States Constitution; [44] (3) given the fact that Kentucky transferred him out of the jurisdiction against his will, Rayborn was not a fugitive, and it was thus improper to extradite Rayborn to Kentucky on a fugitive warrant; [45] and (4) some combination of the above conduct was a violation of Rayborn's rights under Section 2 of the Kentucky Constitution.[46] Although, this opacity has continued in subsequent cases, and the Court has failed to identify a consistent, underlying principle for the forfeiture rule, the most clearly articulated explanations are: (1) that an unauthorized transfer of custody constitutes a de facto commutation of sentence

---

40. *See* KRS 440.450(Art. III)(1).

41. *Jones v. Rayborn, supra* note 1 at 745–747.

42. *Id.* ("And, if the Governor may waive a right of the State when he is not attempting to exercise his right to pardon and is acting in another field, we see no reason why other officials of the State should not also bind the State by their official acts.").

43. *People ex rel. Milburn v. Nierstheimer*, 401 Ill. 465, 82 N.E.2d 438, 440 (1948) ("In order to constitute petitioner's delivery to Federal

authorities a waiver of jurisdiction over him and thus, in effect, a pardon or commutation of his sentence, it was necessary that the delivery be made pursuant to the direction of the Governor. No showing having been made that the Governor authorized his release to Federal authorities, petitioner's contention cannot prevail.").

44. *Jones v. Rayborn, supra* note 1 at 747.

45. *Id.* at 747–8.

46. *Id.*

because no mechanism exists for Kentucky to reclaim custody of the inmate;[47] and (2) that Kentucky violates an inmate's Kentucky Constitutional right to be free from arbitrary treatment when it transfers custody of the inmate without statutory authorization to do so.[48] After examining these stated grounds, we conclude that neither principle justifies the rule.

We see a number of problems with the first rationale,[49] not the least of which is that its initial premise—that state-to-state extradition is available for only a narrow class of "fugitives" who have actually voluntarily fled the requesting state to avoid prosecution—is inconsistent with existing judicial interpretation. In order "[t]o be a fugitive from justice ... the accused need only be absent from the demanding state when it seeks to have him answer for the crime, and be found within the jurisdiction of another state,"[50] and "[a]n alleged offender's status as a fugitive from justice is not affected by the fact that he has been brought into the asylum state involuntarily, or even unlawfully."[51] However, even if this rationale's initial premise were not flawed, this explanation fails to hold water because our past application of the forfeiture rule has not been consistent with it. Specifically, if an inmate who is surrendered involuntarily to another jurisdiction cannot be a fugitive from justice and therefore cannot be returned to the original jurisdiction, it stands to reason that Kentucky courts: (1) would not extradite a person to a sister state if that jurisdiction had previously relinquished custody over him to another jurisdiction; (2) would apply the forfeiture rule in cases where Kentucky officials surrendered custody over a defendant prior to his trial on Kentucky charges or a defendant incarcerated for another offense; and (3) would apply the forfeiture rule to any criminal sentence—including a sentence of death. Of course, as described above in Part III(A), Kentucky courts have applied the forfeiture rule in none of those circumstances.[52]

**47.** *See Prather v. Commonwealth, supra* note 25 at 176 ("In *Jones v. Rayborn* and *Davis v. Harris,* ... we held that Kentucky had waived its rights to a return of the prisoners to this state."); *Crady v. Cranfill, supra* note 29 at 643:

> When a prisoner of one state is transferred without reservation, and without his consent, to another state in order that he may be subjected to confinement in the latter, there is some reason to say that upon his release in the second state he is not a 'fugitive from justice' and thus cannot properly be extradited. Quite possibly, the waiver principle originated in that theory. *Id.*

**48.** *See Yost v. Smith,* Ky., 862 S.W.2d 852, 854 (1993):

> The Corrections Department's transfer of Yost ... was in direct violation of Section 2 of the Constitution of the Commonwealth of Kentucky. Such capricious and dilatory tactics were unreasonable and completely failed to follow a statutory or judicial scheme.

> Therefore, we hold the transfer of Appellant Yost, without proper statutory authority, operated as a forfeiture of the Commonwealth of Kentucky's right to enforce the completion of the sentence under which it was holding him at the time of the transfer. *Id.*

**49.** We would observe that, because Appellee completed service of his federal sentence in a federal prison located in Manchester, Kentucky, the Commonwealth of Kentucky could obtain custody of Appellee without resort to the extradition process, and this rationale is thus not germane to Appellee's situation. Accordingly, this case illustrates that the "inability to extradite" rationale fails to justify application of the forfeiture rule in all cases.

**50.** 31A AM. JUR. 2D *Extradition* § 22 (2002).

**51.** *Id.* § 24.

**52.** *See* notes 25–27 and 29, *infra,* and surrounding text.

With respect to the "violation of Kentucky Constitutional rights" rationale, the forfeiture rule appears to constitute its own "island" of due process jurisprudence in which simple negligence on the part of county-level jail officials will constitute a constitutional rights violation with its own, singularly harsh and, from all appearances, unexamined, remedy. In the context of other alleged due process violations, we have held that Kentucky Constitution § 2 prohibits only conscious violations [53] and have distinguished between simple negligence and due process violations by requiring a claimant to demonstrate bad faith.[54] Similarly, and in accordance with recent United States Supreme Court's due process jurisprudence,[55] other jurisdictions have required heightened-culpability showings as a precondition to habeas relief.[56] Our forfeiture rule cases, however, have not required parties seeking habeas relief

to make any such showing before the rule will operate to jettison sentences lawfully imposed by Kentucky circuit courts.[57] Further, we would again observe that the forfeiture rule has not been applied consistently with its purported theoretical foundation—after all, if the forfeiture rule is the appropriate remedy when inmates are treated capriciously, why is the remedy unavailable to "arbitrarily treated" pre-trial detainees or defendants who have been sentenced to death? Additionally, the moral force of this alleged basis for the rule suffers substantially from the fact that, Kentucky courts have, in every context other than unauthorized custody transfers between sovereigns, applied the prevailing rule that "a writ of habeas corpus will not lie to challenge the conviction or imprisonment of one who was brought by unlawful means into the jurisdiction where he was convicted." [58] In particular,

**53.** *See Standard Oil Co. v. Boone Co. Board of Supervisors,* Ky., 562 S.W.2d 83, 85 (1978); *Kentucky Milk Marketing v. Kroger Co.,* Ky., 691 S.W.2d 893, 899 (1985).

**54.** *See Collins v. Commonwealth,* Ky., 951 S.W.2d 569, 571–573 (1997).

**55.** *See County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).

**56.** *See Hawkins v. Freeman,* 195 F.3d 732, 746 (4th Cir.1999):
> To declare the Parole Commission's decision [to revoke Appellant's mistakenly-granted parole and reincarcerate him on his sentence almost two (2) years after his release] so "egregious and outrageous" as to "shock the contemporary conscience" under these circumstances, we would have to believe that it was infected or driven by something much worse—more blameworthy—than mere negligence, or lack of proper compassion, or sense of fairness, or than might invoke common law principles of estoppel or fair criminal procedure to hold the state to its error. To keep things in constitutional perspective, we would have to see in it a mindless "abuse of power," or

> a deliberate exercise of power "as an instrument of oppression." . . .
> We do not believe the Parole Commission's decision can be declared one meeting that stringent threshold constitutional test. Nothing about it suggests any element of vindictiveness or of power exercised simply to oppress.

*Id.* (citations omitted); *Hunterson v. DiSabato,* 308 F.3d 236, 246–7 (3rd Cir.2002) ("The relevant level of arbitrariness required in order to find a substantive due process violation involves not merely action that is unreasonable but, rather, something more egregious, which we have termed at times 'conscience shocking,' or 'deliberately indifferent.' "); *Kelly v. State,* 61 S.W.3d 341 (Tenn.Crim.App. 2000).

**57.** *See Yost v. Smith, supra* note 48 at 856 (Spain, J., dissenting).

**58.** *Riley v. Commonwealth,* Ky., 539 S.W.2d 285, 286 (1976) (where the Court affirmed a denial of habeas relief after "accept[ing] as undenied appellant's contention that he was kidnaped from the state of Michigan by Graves County authorities without any sort of extradition papers and returned to the Commonwealth of Kentucky to stand trial in the

it appears that Kentucky courts are in lockstep with their federal counterparts as to "irregular renditions"[59] and therefore must have elected to ignore a closely-related class of arbitrary treatment when we held that "neither the jurisdiction of the court nor the right to put him on trial for the offense charged is impaired by the manner in which he was brought from another jurisdiction, whether by kidnaping, illegal arrest, abduction, or irregular extradition proceedings."[60]

■ After an examination of these stated rationales, we must agree with a conclusion our predecessor reached four (4) decades ago in *Crady v. Cranfill*—the forfeiture rule is simply the product of judicial fiat:

> In any event, considering the traditional definition of "waiver" as a unilateral and intentional relinquishment of a known right, it is apparent that as a description of the process by which a state may inadvertently lose its right over a prisoner because he has been unfairly handled by its officers, the term is a misnomer. Actually, the process is more in the nature of a forfeiture, judi-

cially invoked to secure fair treatment of the prisoner by the state.... [O]ur *Jones* opinion mentions in passing both the 14th Amendment of the U.S. Constitution and § 2 of the Kentucky Constitution, but does not categorically place the decision of the case on either. On further reflection, we have concluded that the question is not one of constitutional rights, but of state policy.[61]

And, our review of the relevant precedent leads us to the conclusion that this harsh remedy, which, for all practical purposes, empowers deputy jailers to countermand our circuit courts' judgments, is a relic that has outlived its usefulness. While the forfeiture rule may have had a place as a prophylactic measure designed to prevent regression in the midst of a paradigmatic change in correctional philosophy,[62] we can discern no similarly compelling reason for a forfeiture rule in the 21st Century. Accordingly, we abandon the forfeiture rule previously applied by this Court and specifically overrule *Jones v. Rayborn, Davis v. Harris, Thomas v. Schumaker, Balsley v. Commonwealth,* and *Yost v. Smith* to the extent that those opinions hold that

---

Graves Circuit Court." *Id.* at 285.). *See also Lyons v. Thomas,* Ky., 378 S.W.2d 798 (1964).

**59.** *See Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) (finding no violation of due process under the federal constitution when defendant was "forcibly and with violence" abducted from Peru and brought to Illinois for trial); *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952) (affirming state's denial of habeas relief when defendant was "forcibly seized, handcuffed, blackjacked" and taken from Illinois to Michigan for trial); *United States v. Alvarez–Machain,* 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) (forcible abduction from Mexico).

**60.** *Riley v. Commonwealth, supra* note 58 at 286. *See also Roberts v. Commonwealth,* Ky., 417 S.W.2d 234 (1967) (holding that an illegal arrest will not affect a subsequent conviction).

**61.** *Crady v. Cranfill, supra* note 29 at 643 (citations and footnotes omitted).

**62.** *See Jones v. Rayborn, supra* note 1 at 748, citing *Ex Parte Drake,* 233 P.2d 931, 935 (Cal. Dist.Ct.App.1951) (in which the Court held that "[d]uring the past two decades great progress has been made in penal treatment, by putting into ever-widening practice the ideas that thinking penologists have striven for centuries to realize. We know now that the prison administrator's task is to rehabilitate the offender and make plans for him to return to the community...."); *Gall v. Commonwealth, supra* note 22 at 44 ("The underlying purpose of limiting transfer in these cases was to prevent the interruption of the rehabilitative function of the penal system.").

**38**

Kentucky forfeits its sentence any time its officials, acting without statutory authorization, transfer custody of an inmate serving a Kentucky sentence to another sovereign.

██ Without the forfeiture rule, Appellee's petition lacks any grounds warranting habeas relief. Although the trial court acted properly when it followed existing precedent and granted Appellee's petition for a writ of habeas corpus releasing him from his Pulaski Circuit Court sentence, upon reconsideration of the policy at issue here, we find that the trial court's legal conclusion was erroneous and hold that the Commonwealth of Kentucky did not forfeit its right to require Appellee to satisfy his sentence. Appellee was found guilty of violating the law of two (2) sovereigns, and was thus subject to two (2) sentences, which, under the law of this case, were to be served consecutively. While Appellee had satisfied his federal sentence at the time he sought habeas relief from the Laurel Circuit Court, he had yet to satisfy the sentence imposed by the Pulaski Circuit Court, and thus Appellee was not entitled to a writ of habeas corpus.

## IV. CONCLUSION

For the above reasons, we reverse the decision of the Court of Appeals and remand this matter to the Laurel Circuit Court for it to enter an order denying Appellee's petition for a writ of habeas corpus.

All concur.