*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SCOTT LEE TINSLEY,

        *Petitioner-Appellant,*

    *v.*

No. 02-5796

GEORGE MILLION, Warden,

        *Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 00-00249—Henry R. Wilhoit, Jr., District Judge.

Argued: December 2, 2004

Decided and Filed: February 22, 2005

Before: GILMAN and SUTTON, Circuit Judges; McKEAGUE, District Judge.[*]

---

## COUNSEL

**ARGUED:** Howard J. C. Nicols, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellant. Perry T. Ryan, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Howard J. C. Nicols, Steve A. Delchin, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellant. Perry T. Ryan, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

---

## OPINION

---

    SUTTON, Circuit Judge. Scott Lee Tinsley challenges the district court's denial of his petition for habeas corpus relief following his conviction and 75-year sentence for the murder of Tammy Marie Brier. For the reasons that follow, we affirm the judgment in all respects but one—whether Tinsley's counsel provided ineffective assistance at the penalty phase by failing to give an opening and closing argument—which we remand to the district court to consider in the first instance.

---

[*]The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

I.

On October 30, 1987, Brier was beaten and shot to death after a violent struggle in her home. Police found blood in more than one room of the house, including evidence of a pool of blood in a room separate from where the body was found. Brier had multiple blunt trauma wounds to the face and multiple "defensive wounds," JA 536, including bruises, abrasions and lacerations on her hands and arms. More critically, the assailant shot her three times. Investigators concluded that she was shot first in the chest, probably in a different room from where her body was found. She was then shot in the side of the head, which would have incapacitated and possibly killed her. Finally, she was shot at point blank range through the nostril, presumably after she was unconscious because such a shot is inconsistent with "a person who is awake and alert and struggling." JA 542.

The evidence produced at trial showed that Brier's live-in boyfriend, Scott Lee Tinsley, had been playing cards with friends that night. At some point during the evening, he left the card game and returned home, armed with a .380 automatic pistol. A short time later, Tinsley returned to the site of the card game holding an infant child, Simon, who was his and Tammy's son. Tinsley and Simon both had blood on their clothes, including a fine mist of blood spatters on Tinsley's shirt and blood smears on Tinsley's clothes.

Police at the scene located six spent .380 cartridges on the floor of the home and found gunshot residue on Tinsley's hands. The police also placed Tinsley's car in the driveway and determined that a bullet hole in his car matched the angle of a bullet hole in his house, suggesting that Tinsley's car was present when a shot was fired from within the house.

On November 2, 1987, a Kentucky grand jury indicted Tinsley for the murder of Brier. Tinsley pleaded not guilty, maintaining that he came home from a card game to find intruders leaving the home and that he and the intruders had exchanged gunfire outside the home. He claimed that he entered the home to find Brier already dying of her injuries, and her blood ended up on his clothes when he picked her up and held her. Tinsley Br. at 7. He also claimed that he had been working on and firing guns earlier that day, which explained the presence of gunshot residue on his hands.

Tinsley's initial trial was held in May 1989. On the third day of the trial, Tinsley moved for a mistrial on the ground that the prosecution had failed to disclose exculpatory evidence, a blood-stained "sleeper" that Simon had been wearing on the night of the murder. The trial court agreed that the sleeper was exculpatory—because it could show that Tinsley had Brier's blood on his clothes only because he picked up Simon at which point the blood on the sleeper transferred to Tinsley's clothes—and granted the mistrial. Tinsley filed a writ of prohibition to bar a second trial on double-jeopardy grounds, but the state courts (ultimately the Kentucky Supreme Court) rejected the claim on the ground that the prosecution had not acted in bad faith in failing to disclose the sleeper. *Tinsley v. Jackson*, 771 S.W.2d 331 (Ky. 1989).

A new trial was held on August 28 and 29, 1989, at the end of which the jury found Tinsley guilty of Brier's murder. After the bifurcated penalty phase of the trial in which the prosecution sought a 90-to-100-year sentence, the jury sentenced Tinsley to a 75-year prison term.

Tinsley sought two forms of relief from his conviction and sentence in the state courts—first a direct appeal, then a post-conviction challenge—both unsuccessfully. Having exhausted these state-court options, Tinsley filed a federal habeas petition on June 26, 2000. He raised the following claims: ineffective assistance of counsel, double jeopardy, denial of due process, right to a properly empaneled grand and petit jury, right to be tried by indictment, right to a trial by an impartial jury and right to be free from compulsory self-incrimination. After an evidentiary hearing concerning the penalty phase, a magistrate recommended denying habeas relief on all claims. With one

exception (the addition of another ground on which habeas relief should be denied), the district court accepted the magistrate's report and recommendation, denying Tinsley's petition on June 11, 2002.

## II.

Under the Anti-Terrorism and Effective Death Penalty Act, we may grant relief on a federal constitutional claim decided by the state courts on the merits only if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362, 405 (2000). Findings of fact made by the state court are presumed correct, and this presumption may be rebutted only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Mitchell v. Mason*, 325 F.3d 732, 737–38 (6th Cir. 2003).

## A.

Tinsley first argues that his trial counsel, Harry Hellings, provided ineffective assistance in violation of the Sixth (and Fourteenth) Amendment in a variety of ways. To establish ineffective assistance of counsel, a petitioner must show (1) that his lawyer's performance was deficient and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In satisfying the first requirement, the petitioner must establish that his lawyer's performance "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Id*. at 687–88. Judicial review of the lawyer's performance must be "highly deferential," with "a strong presumption" that a lawyer's conduct "falls within the wide range of reasonable professional assistance." *Id*. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *see also Wiggins v. Smith*, 539 U.S. 510 (2003); *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004).

In satisfying the second requirement—prejudice—the petitioner must demonstrate a "reasonable probability" that the result of the trial would have been different but for counsel's mistakes. *Strickland*, 466 U.S. at 694. A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome," *id.*, but something less than a showing that the outcome more likely than not would have been different, *id*. at 693. While the claimant need not conclusively demonstrate his "actual innocence," *compare Schlup v. Delo*, 513 U.S. 298, 327 (1995) (requiring petitioner to establish more likely than not that no reasonable juror would have convicted him), *with Strickland*, 466 U.S. at 693 ("we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"), the focus should be on whether the result of the trial was "fundamentally unfair or unreliable," *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

## 1.

Tinsley initially claims that Hellings provided ineffective assistance during the voir dire, pointing to what the Kentucky Court of Appeals described as Hellings' "unusual" strategy, JA 167, of allowing potential jurors to volunteer to be removed with seven of the defense's nine peremptory challenges. But "unusual" or not, this strategy came at the end, not the beginning, of considerable other information gathering about the jury pool, came after considerable consultation with his client about the jury pool and, placed in the context of the rest of the voir dire, was not merely an invitation for volunteers to leave the jury but an inquiry about whether prospective jurors could be fair in deciding Tinsley's case. Under these circumstances, ineffective assistance of counsel did not occur.

First, Tinsley and Hellings were not starting from a clean slate; they had already picked one jury from the same community before. In view of the mistrial that was declared three days into the

first trial, Tinsley and Hellings had already had an opportunity to share considerable information about the prospective juror pool, and notably Tinsley has registered no complaints that his counsel took an overly casual approach to voir dire when they picked their first jury. Indeed, as he points out in his double jeopardy argument, *see section B below*, Tinsley was quite satisfied with the first jury.

Second, before the beginning of the second trial, Hellings provided Tinsley with roughly 300 completed questionnaires from the initial pool of prospective jurors, after which Tinsley identified 50 individuals from the group as favorable to him. When it came time for the voir dire, however, all of these individuals had been dismissed from the pool of eligible jurors for one reason or another. After Tinsley saw the approximately 30 individuals who remained, he said to Hellings and his co-counsel, Gina Nutter, "I'm sunk, I can't get a fair trial here." JA 205. Hellings then asked, "Who do you want off?" to which Tinsley replied, "All of them." *Id.* Hellings then stated, "It doesn't matter who stays on then." *Id.* After this point, as Tinsley acknowledges, "[t]here was no further attorney/client conversation concerning jurors." *Id.*

Third, even after his experience in picking the first jury and even after learning that Tinsley was not content with any of the 30 members of the jury pool, it is inaccurate to suggest that Hellings merely asked for volunteers in using his peremptory challenges. As the transcript of the voir dire and the state court's evidentiary hearing on this point reveal, Hellings' efforts on behalf of his client were far more extensive and probing. In conducting an extensive voir dire that covers 21 pages of transcript, Voir Dire Tr. at 2–22, Hellings began by asking the venire members:

> Did you ever stop to think that it might be your duty, your responsibility and your obligation not to sit as a juror? . . . What if for some reason you couldn't be fair? Because you know someone or you know a witness or because you have some preconceived notion of what something ought to be or something is. Do you think that you should have an obligation at that point in time to take yourself off as a juror?

*Id.* at 3. As the voir dire continued, Hellings went into more detail in explaining what it means to be a juror who could be "fair" in deciding a criminal case—explaining that the burden of proof in a criminal case differs from that in a civil case, that the jury could not hold it against Tinsley that he had been tried once already, *id.* at 4, that the prosecution, not the defense, has the burden of proof, *id.* at 5, that jurors may not "guess" that a defendant is guilty, *id.* at 11, that the defendant may not be saddled with the burden to "disprove" anything, *id.* at 12, that jurors have a duty to judge a case "fairly and impartially," *id.* at 10, and that jurors may not hold against a defendant his decision not to testify, *id.* at 14–15.

At the same time, Hellings assessed the venire members' past jury experience, using their answers as an opportunity to highlight the difference in proof burdens between civil and criminal trials and the difference in sentencing procedures between state and federal criminal trials. *Id.* He asked two jurors—one of whom had sat through part of Tinsley's first trial and another of whom had a prior relationship with people involved in the case—whether they could decide the case fairly. *Id.* at 19–20. When the juror with a prior relationship expressed doubt, Hellings informed the venire members that he could use his nine peremptory challenges to remove anyone "for no reason whatsoever," and asked the juror whether she wanted him to remove her because of this concern. *Id.* at 20. She said yes, and Hellings removed her. He then asked the remaining potential jurors whether "anyone else here by virtue of what you have heard or what you feel in your heart that you couldn't be fair." *Id.* at 21. Ultimately, six more jurors asked to be removed, and Hellings used six more of his peremptory challenges to remove them, *id.*, and apparently used his remaining two peremptory challenges as well. In other words, Hellings did not merely ask for volunteers. After going through the duties of the jurors, he asked the venire whether they could be "fair," whether in other words they could satisfy this foundational requirement of deciding a criminal trial. When

seven members of the venire said no and said they would rather not serve on the jury under these circumstances, he excused them. An experienced criminal defense attorney who had tried roughly 1,000 criminal cases since 1975, Hellings testified that he wished to eliminate jurors who could not be fair and those who wanted to avoid jury duty—a characteristic that Hellings equated with an unwillingness or inability to listen to all of the evidence presented.

Fourth, Hellings' questions were not the only ones asked of the jury pool. The prosecutor conducted a voir dire, and the trial judge gave instructions to the venire, both of which came before Hellings began his voir dire and lasted "about 45 minutes." Voir Dire Tr. at 2, 4. In attempting to support his ineffectiveness claim, Tinsley has not produced the transcripts from these parts of the proceeding. But it seems clear from the parts of the transcript that were produced that Hellings and Nutter learned additional information from the questions that preceded his voir dire—for example, that one potential juror had a close personal relationship with someone involved in the crime and that another juror had sat in on part of Tinsley's first trial. Voir Dire Tr. at 19.

Tinsley nonetheless faults Hellings and Nutter for failing to examine more carefully the 30 members of the venire, pointing out that four of the selected jury members had potentially disadvantageous relationships with Tinsley. Mr. Walls was a friend of the victim's family, an "ex-jailer," JA 167, who was aware of Tinsley's prior manslaughter conviction, and a spectator at Tinsley's first trial. Mr. Hayes was "in law enforcement," JA 168. Mr. "Brown" or "Bowen" was a gun dealer who knew people in law enforcement. (Tinsley's appellate brief refers to "Mr. Brown" as the gun dealer, as does the Kentucky Court of Appeals opinion, JA 167, and the district court's opinion, D. Ct. Op. at 17. Yet Tinsley refers to "Mr. Bowen" as the gun dealer in his testimony during the original state court hearing, JA 784, and in his original habeas petition, JA 30–31.) And Mrs. Coulter was the mother of a girl that Tinsley had dated and allegedly did not like Tinsley. But, from the perspective of Hellings' client, the problem was not 4 members of the pool; it was all 30 of them. In determining whether any venire member had a potentially disadvantageous relationship with Tinsley, Hellings used an appropriate and long-established tactic: he asked the defendant. Having failed to obtain any further guidance from his client, Hellings reasonably chose to use his peremptory challenges based on other factors—whether the potential jurors could be fair and open-minded in deciding the case. *Id.* at 21 ("But I can take nine of you off. Is there anyone else here by virtue of what you have heard or what you feel in your heart that you couldn't be fair. I mean, that's the bottom line. I mean . . . we are talking about fundamental fairness."). And that question was not asked in a vacuum; Hellings repeatedly asked the potential jurors whether they could decide the case fairly, including at one point suggesting that they might not be able to decide the case fairly, "[b]ecause you know someone or you know a witness." Voir Dire Tr. at 3.

Hellings also engaged at least three of these four jurors during the voir dire and spoke directly to Walls and Hayes more than any other prospective jurors. Plainly aware of Walls' knowledge of the case, he spoke to him personally six times during the voir dire. *Id.* at 4–5, 11, 14, 18, 19. After noting that Walls had some familiarity with the case, he specifically asked him whether he had "formed any opinions or conclusions as a result of that?" to which Walls responded "No." *Id.* at 19. "So you know what is coming," Hellings continued, "You have had a preview. All right. You could vote your conscience in the case independent of that, is that correct?" *Id.* "Right," Walls responded. *Id.* A lawyer is entitled to believe a juror who says he or she can be fair in deciding a case. Hellings engaged Hayes six times as well. *Id.* at 4, 6–7, 11, 14, 18. Among other things, he asked him "If you had to vote right now, what would your verdict be?" to which Hayes responded "Not guilty" because he had not yet heard any proof. *Id.* at 4. He also learned that in Hayes' prior jury experience, a burglary case, the jury had reached a verdict on some charges but not others, then confirmed that no "opinions or conclusions about that particular lawsuit [ ] would spill over into this one." *Id.* at 6. He then confirmed that Hayes understood "what reasonable doubt means." *Id.* at 6–7. Hellings engaged a "Mr. Brown" twice, *id.* at 7–8, 14, once asking whether his jury experience in a previous criminal trial had left him with "[a]ny opinions or conclusions that

would affect your ability to judge" this case, to which Brown responded "No." *Id.* at 7–8. (The transcript does not clarify whether this "Mr Brown" is the "Mr. Bowen" to whom Tinsley referred during the state court evidentiary hearing on this issue.) Hellings engaged Mrs. Coulter once, confirming that it would be inappropriate to judge a defendant on the basis of the ground that "where there is smoke there must be fire." *Id.* at 17.

On this record, Tinsley has not established ineffectiveness of counsel, much less that the Kentucky courts unreasonably applied Supreme Court precedent in denying this claim. *See Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

Nor, at any rate, has Tinsley satisfied the second element of this claim—establishing that he was prejudiced by his counsel's performance. In complaining that these four jurors were allowed to be seated on the jury, Tinsley has failed to show that any one of them had "actual bias" against him, which is what is required to establish prejudice. *See Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001) ("Because [the] claim of ineffective assistance of counsel is founded upon a claim that counsel failed to strike a biased juror, [the claimant] must show that the juror was actually biased against him."); *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001) ("To maintain a claim that a biased juror prejudiced him, however, [Petitioner] must show that the juror was actually biased against him."). Far from a situation in which the seated jurors had actual bias, one of the challenged jurors in this case confirmed in a question directly to him that he could fairly try the case, and the others answered general questions confirming that they could be fair.

2.

Tinsley next argues that Hellings provided ineffective assistance when he failed to "question" the prosecution's alleged mishandling or withholding of certain evidence: a palm print found on the gun at the scene; a round from the murder weapon that may have had fingerprints but was not tested; the victim's socks, which were destroyed by the state; Simon's sleeper, which was initially rejected as evidence and later misplaced; and a lost phone bill potentially showing a short time frame in which Tinsley could have committed the crime. But the state and district courts agreed that Tinsley, in the words of the Kentucky Court of Appeals, failed to "even attempt[] to link up the foregoing with a showing of prejudice." JA 173. And Tinsley fails to overcome that problem here: He does not illustrate how, specifically, he was prejudiced by Hellings' lack of action in this regard, instead relying on the cumulative error theory discussed (and rejected) below. In a footnote to this claim, Tinsley argues that "the withholding of evidence favorable to the accused also violated Tinsley's due process rights and provides an independent basis for relief." Tinsley Br. at 36. But even assuming that this claim has not been procedurally defaulted, Tinsley has failed to supply us with any argument, other than a conclusion, to support this claim. That does not suffice. *See Northland Ins. Co. v. Stewart Title Guaranty Co.*, 327 F.3d 448, 452 (6th Cir. 2003) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at a developed argumentation, are deemed waived.") (quotation marks omitted).

3.

Tinsley next argues that Hellings provided ineffective assistance of counsel because he failed to hire a blood-spatter expert to refute the testimony of the prosecution's blood-spatter expert, Larry Ayers. The question here is whether Hellings was required to obtain an expert of his own or whether it sufficed to subject the prosecution's expert to cross-examination.

Ayers testified that blood on Tinsley's clothes suggested he was present when Brier was shot. Hellings cross-examined Ayers, and Ayers acknowledged the possibility that the spatters could have fallen on Tinsley's clothes when he picked up Brier and dropped her head back into a pool of blood. To the same end, Hellings cross-examined the assistant chief medical examiner, who acknowledged that the spatters could have fallen on Tinsley's clothes when he shook his blood-soaked hands after holding Brier. Putting to the side the question whether this was ineffective—it most probably was not—Tinsley has failed to establish prejudice arising from the modest difference between the jury hearing this theory of defense through cross-examination and hearing it through the mouth of another expert. Nor has Tinsley identified an expert who would have testified that these possibilities were more probable than the possibility that the spatters on his clothes were caused by the shooting. Indeed, as the district court noted, Tinsley has yet to "come forward with [ ] evidence to suggest that there were experts to be had who would have reached opinions and given testimony contrary to those of the Commonwealth's experts," other than conclusory allegations that such experts exist. D. Ct. Op. at 24.

Tinsley correctly identifies one problem with the wording of the Kentucky Court of Appeals opinion on this point, which said that failure to produce a witness is not error "absent an allegation that the testimony of the witness would have compelled acquittal." JA 171. *Strickland*, it is true, does not require allegations that would "compel[] acquittal," only claims that would establish a "reasonable probability" of a different outcome. *See Williams*, 529 U.S. at 405–06 ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'") (quoting *Strickland*, 466 U.S. at 694). But this error is of no consequence because, even under the correct standard, Tinsley has not established prejudice.

Tinsley also claims that Hellings' failure to hire a blood-spatter expert for the defense violated his rights to due process and a fair trial. *See Ake v. Oklahoma*, 470 U.S. 68, 86–87 (1985) (requiring funds for a court-appointed psychiatrist when an indigent defendant raised an insanity defense). Even if we were to accept Tinsley's argument that *Ake* "applies when an expert in blood spatter evidence is needed," Tinsley Br. at 38—*see Terry v. Rees*, 985 F.2d 283 (6th Cir. 1993) (holding that an indigent defendant was entitled to funds for a pathologist to testify on the victim's cause of death)—Tinsley has not shown how the government interfered with or failed to fund his request for an independent expert, which is fundamental to *Ake*. *See* 470 U.S. at 77 (requiring that "basic tools of an adequate defense or appeal . . . *be provided to those defendants who cannot afford to pay for them*") (emphasis added; quotation marks omitted). As Tinsley acknowledges, he provided sufficient funds to Hellings to hire an expert, but Hellings chose not to hire one. Tinsley Br. at 37.

4.

Tinsley next points to several other alleged deficiencies in Hellings' performance during the guilt phase of the trial, not one of which establishes deficient performance. He criticizes the following statement by Hellings during his voir dire—"[t]here are no lie detectors in this case. There is no scientific evidence that would exclude my client from doing it or says that he did it," JA 441—explaining that the admission of polygraph evidence is reversible error. *See United States v. Murray*, 784 F.2d 188, 188–89 (6th Cir. 1986). But, as the district court reasoned in rejecting this claim, it is one thing to admit polygraph evidence; it is another to use the concept of polygraph evidence to explain the meaning of reasonable doubt. Hellings, quite plainly, had the latter in mind when he made this statement to the jury and in doing so did not cross any deficient-performance lines.

Tinsley next alleges that Hellings received death threats for representing Tinsley, and those threats created a conflict of interest establishing a presumption of prejudice under *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). But, as *Strickland* explains, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" 466 U.S. at 692 (quoting *Cuyler*, 446 U.S. at 348, 350). Because Hellings did not "actively represent[] conflicting interests," Tinsley had to show prejudice arising from the death threats, which he has not done. At most, he has speculated about a possible conflict; he has not established one and at any rate has not shown how the possibility of a conflict adversely affected Hellings' performance.

Tinsley next argues that Hellings should have requested instructions relating to self-defense and the lesser included offenses of first-degree and second-degree manslaughter. As the Kentucky Court of Appeals properly noted, however, it was a permissible exercise of trial strategy not to request these instructions given that Hellings' primary line of defense was that Tinsley was not the shooter.

Tinsley next argues that Hellings failed to object when the prosecution's blood-spatter expert "told the jury that Tinsley was guilty," which amounted to testimony on an ultimate question of fact. Tinsley Br. at 56. But that is not what the expert said; he testified that the blood spatters were consistent with the high impact spatters caused by a gun shot. As the Kentucky Court of Appeals noted, Ayers "did not testify as to the ultimate issue, *i.e.*, Tinsley's guilt or innocence. He, rather, assisted the jury in understanding the physical evidence." JA 170. Tinsley offers no legal support for the theory that this qualifies as testimony on the ultimate issue for the jury to decide, much less authority establishing that the Kentucky court's conclusion is contrary to clearly established Supreme Court precedent.

Tinsley next criticizes Hellings' failure to object to several of the prosecutor's arguments and actions during his closing statement at the end of the guilt phase of the trial: the placement of Brier's clothes from the night of the murder on the rail of the jury box; the use of photographs of her body; references to matters not in evidence; an emotional statement directed toward Brier's mother; and a statement vouching for the credibility of the State's witnesses. Tinsley Br. at 57–58. But as the Kentucky Court of Appeals noted, "these comments were within the prosecutor's wide range of latitude to comment on the evidence presented at trial, and, taking into consideration legitimate trial strategy, we discern no deficient performance in trial counsel's failure to object." JA 172. Even after the district court, "out of an abundance of caution," D. Ct. Op. at 26, reexamined the closing arguments, it agreed with the Kentucky court's conclusion. We also agree that in this situation, a decision not to object is well within the bounds of legitimate trial strategy. And, more to the point, the Kentucky courts did not fail to respect clearly established Supreme Court precedent in reaching this conclusion.

5.

Tinsley, lastly, claims that Hellings rendered ineffective assistance during the penalty phase of the trial by failing to introduce any mitigating evidence on his behalf. We do not agree.

At first blush, one might fairly question a penalty-phase strategy of this sort. But, in this instance, there was more method to Hellings' strategy than initially meets the eye. Hellings (to say nothing of Tinsley) was not in an enviable position after the jury returned its finding of guilt. The murder was a brutal one. And in determining that Tinsley had committed it, the jury necessarily concluded that Tinsley had not only murdered his girlfriend and the mother of his son but also had done so while his son was in the house. Making matters worse and further narrowing the number of penalty-phase options reasonably available, Tinsley had a prior manslaughter conviction, which Hellings understandably sought to prevent the jury from learning.

At the 2002 district court evidentiary hearing on this issue, Hellings explained that he could not remember many of the details of the 1989 trial. But he did recall that the jury returned its guilt-phase verdict late in the day and that he did not believe the prosecutor was prepared for the penalty-phase of the trial at that point. He also testified that he had spoken to Tinsley about the penalty phase before the first trial and before the second one, and that he had spoken to several of Tinsley's proposed character witnesses—Earl McWhorter, Billy Phillips and Raymond Overstreet—at least one of whom (Mr. McWhorter), he recalled, "had nothing good to say" about Tinsley, JA 845. Under these circumstances, Hellings counseled Tinsley to proceed immediately to the penalty phase (giving the prosecutor no time to mount aggravating evidence), recommended that Tinsley not introduce any mitigating character evidence (giving the prosecutor no opportunity to introduce the manslaughter conviction) and admonished Tinsley not to take the stand (again giving the prosecutor no opportunity to introduce the manslaughter conviction). Hellings discussed his strategy with Tinsley, and Tinsley agreed to it.

After the penalty phase started, however, Tinsley changed his mind and insisted on testifying. In doing so, he did not make any arguments about what his sentence should be but instead urged the jury to reconsider its guilty verdict. In response, as Hellings had anticipated, the prosecution cross-examined Tinsley about his prior manslaughter conviction.

At the Kentucky Court of Appeals, Tinsley (and his counsel) presented a one-paragraph argument on this issue that contained the following heading: "Counsel was ineffective in failing to prepare Tinsley for his penalty phase testimony and in failing to put on mitigating evidence." JA 410. The response of the Kentucky Court of Appeals was also brief: "Tinsley next argues that trial counsel was ineffective in failing to prepare Tinsley for his penalty phase testimony and in failing to put on mitigating evidence. However, Tinsley 'concedes he took the stand against his attorney's advice.' Therefore, trial counsel did not render ineffective assistance with respect to this issue." JA 171. After an evidentiary hearing, the district court agreed, noting that Hellings' decision not to present other proposed witnesses was not a tenable ground for relief, because Tinsley had concurred in Hellings' recommendation to proceed immediately to the penalty phase and because Hellings had spoken to at least one of Tinsley's proposed character witnesses, who had "nothing good to say" about Tinsley. D. Ct. Op. at 30.

Hellings' assistance in this instance was not defective for several reasons. First, he ran the strategy by his client, and the client agreed to it. Second, the recommendation not to introduce mitigating evidence was a defensible one under these difficult circumstances. Had Hellings tried to introduce evidence of Tinsley's good character, his proclivity toward non-violence and his model prisoner conduct, the evidence likely would have opened the door to cross-examination on the conviction. *See Burger v. Kemp*, 483 U.S. 776, 792 (1987) (holding that counsel's decision not to present character witnesses was not unreasonable because prior convictions might have been introduced on cross-examination). Third, contrary to Tinsley's testimony at the hearing on this issue, it is far from true that "bad testimony beats no testimony at all." JA 826. Something, as this trial ultimately showed, is not always better than nothing given the risk that every positive argument by a defendant potentially opens the door to a more-harmful response.

Fourth, Hellings correctly predicted that the prosecutor would present no aggravating evidence if Tinsley did not—for indeed the prosecutor merely presented the text of Kentucky's parole-eligibility statute, which noted that Tinsley would be eligible for parole half-way through any sentence, then rested. Only when Tinsley took the stand against Hellings' advice did the prosecutor, on cross-examination, establish Tinsley's prior manslaughter conviction—something Hellings attempted to derail through an unsuccessful objection. Upon learning that Tinsley would be eligible for parole half-way through his sentence, the jury decided upon a 75-year sentence, considerably lower than the 90-to-100-year sentence the prosecutor requested. Under these unusual, if not unique, circumstances, Hellings' decisions concerning the penalty phase fell within the realm of

legitimate strategy and did not amount to deficient performance under *Strickland*. *See, e.g.*, *Johnson v. Bell*, 344 F.3d 567, 573–74 (6th Cir. 2003) (finding no deficient performance despite the absence of mitigating evidence).

Finally, Tinsley has not shown prejudice from the failure to introduce mitigating evidence. He claims that the following witnesses could have helped his cause: (1) Earl McWhorter, the sheriff; (2) Gladys King, a community store owner; (3) Russell Gifford, a minister; (4) Williams Phillips, Rodney Elam and Cecil Brown, three deputy guards at the Lincoln County Jail; and (5) Tinsley's former supervisors at a lumber company and tobacco warehouse. Of course, as noted, some of these witnesses indicated they would not have been helpful and all of them ran the risk of triggering the admission of Tinsley's manslaughter conviction. More critically, however, Tinsley has not introduced affidavits or any other evidence establishing what they would have said. At the evidentiary hearing, he claimed to have affidavits that simply indicated that they would have testified. In the absence of any evidence showing that they would have offered specific favorable testimony, Tinsley cannot show prejudice from counsel's strategy recommendation not to introduce this evidence.

In response to all of this, Tinsley points to cases from this circuit, *see Skaggs v. Parker*, 235 F.3d 261, 269 (6th Cir. 2000); *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997), and from the Eighth Circuit, *see Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir. 1983), in which the courts found ineffective assistance of counsel for failure to present mitigating evidence. But the strategic circumstances facing the attorneys in these cases have little in common with the circumstances facing Hellings. In *Skaggs*, counsel chose not to introduce mitigating evidence of the defendant's mental retardation and diminished mental capacity, 235 F.3d at 272, and in *Pickens* counsel chose not to introduce mitigating evidence regarding the defendant's history of abuse by his father, 714 F.3d at 1466. But in neither instance did this evidence have the boomerang risk that rightly concerned Hellings. In *Austin*, this court noted that trial counsel's complete failure to investigate or present any mitigating evidence amounted to an "abdication of advocacy." 126 F.3d at 849. The same cannot be said here. Hellings spoke to three of Tinsley's proposed witnesses and determined that at least one of them "had nothing good to say" about Tinsley. D. Ct. Op. at 30. At any rate, Tinsley still has produced little mitigating evidence that could have been introduced without undertaking the risk that the prosecution would introduce the manslaughter conviction on cross-examination. The only exception is Tinsley's contention that Hellings should have highlighted Tinsley's remaining family responsibilities: caring for the now-motherless Simon and for Tinsley's dependent father. D. Ct. Op. at 29. But in opting not to raise this argument, Hellings' conduct fell within the bounds of legitimate strategy, given the risk that the jury could bristle at the notion that Tinsley's family responsibilities—caused in part by his decision to murder Simon's mother—called for a lighter sentence.

Tinsley appears separately to argue that Hellings rendered ineffective assistance because he did not give an opening or closing argument. Neither the Kentucky Court of Appeals decision nor the district court decision addresses this claim. Based on the briefs filed in both courts, it seems that the claim was not presented to the state court of appeals (where he had counsel) and the point is raised as part of one sentence in his brief to the district court (where he did not have counsel). Nor, perhaps as a result of this absence of briefing, is the record complete on this point. The record does not include the prosecutor's opening statement, and it is not entirely clear whether Hellings gave a closing statement. The partial transcript of the penalty phase suggests that he did not give a closing statement, but he testified that he always gave one, he assumed that he gave one here and he would only have waived a closing argument if there were a good reason for doing so.

We have some initial skepticism about this claim—first because it is not clear that it was exhausted in state court or fairly presented in the district court and second because it was not necessarily deficient counsel to waive these arguments when no mitigating evidence was going to

be introduced.  As to the absence of an opening statement, Hellings, a seasoned criminal defense lawyer who had tried 1,000 criminal cases before this trial, testified that he never made an opening statement in the penalty phase of a criminal trial.  As to the absence of a closing statement, it is not clear why Hellings could not conclude, as a matter of strategy, that the prosecutor had produced no evidence or arguments worthy of attempted rebuttal, given that the prosecutor had introduced only the rules on parole eligibility.  True, the prosecutor did refer to Tinsley's prior manslaughter charge in his closing statement.  But it is not clear what Hellings productively could have done in response to this problem.  Tinsley suggests that Hellings could have pointed out that the victim in Tinsley's first manslaughter conviction was an unsympathetic leader of a motorcycle gang, presumably to establish a contrast with the sympathetic victim of the current murder conviction.  But it is far from self evident that an attorney advances his client's cause by attempting to distinguish his client's murder convictions on the ground that one victim was a sympathetic individual while the other was not, particularly during a sentencing hearing arising from the murder of the *sympathetic* victim.  As with many of Hellings' decisions, this alternative strategy ran the risk of doing more harm than good.

Nonetheless, we remand this claim to the district court for consideration in the first instance.  The district court should determine whether the claim has properly been exhausted and, if so, whether it was properly raised in Tinsley's federal habeas petition.  In the event the claim has been exhausted and preserved, the court should attempt to expand the record to include the prosecutor's opening statement, should attempt to determine whether Hellings indeed did not make a closing argument, make any other pertinent fact findings and reach its own conclusion on the merits of this claim.

B.

Tinsley next claims that his second trial violated his rights under the Double Jeopardy Clause of the Fifth Amendment.  We disagree.

The Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  When a court declares a mistrial without the defendant's consent, re-prosecution violates the Double Jeopardy Clause unless "there is a manifest necessity for the [mistrial], or the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 U.S. (9 Wheat) 579, 580 (1824); *see also Arizona v. Washington*, 434 U.S. 497, 500 (1978).  When a court declares a mistrial at the behest of the defendant, however, "the 'manifest necessity' standard has no place in the application of the Double Jeopardy Clause." *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982).  Rather, if the defendant "*requested* a mistrial . . . , there would be no doubt that if he had been successful, the Government would not have been barred from retrying him," *United States v. Tateo*, 377 U.S. 463, 467 (1964)—with one exception. Namely, when "bad-faith conduct by [a] judge or prosecutor" forces a defendant to move for a mistrial, re-prosecution is barred even though the defendant consented to the mistrial. *United States v. Dinitz*, 424 U.S. 600, 611 (1976).

How do these rules apply here?  If Tinsley had not moved for a mistrial, the proper question would be whether the mistrial was a "manifest necessity," not whether the prosecutor acted in bad faith when he failed to disclose the sleeper.  But, in this case, Tinsley did move for a mistrial, First Trial Tr. at 322, Gov. Mot. to Take Judicial Notice, Appx. 5 ("At this time we would move to set aside the swearing of the jury and grant a mistrial."), and it was in ruling on that motion that the court declared the mistrial.  During testimony and argument on Tinsley's motion, Tinsley never rescinded or amended his motion.  Indeed, Tinsley objected to a mistrial only some time after—not even immediately after—the district court had granted his motion.

After the court had granted the mistrial, it tried to confirm with the parties (for reasons that remain unclear) that the mistrial would not bar re-prosecution. In response, Tinsley first alerted the court that he thought re-prosecution was barred *on grounds of prosecutorial bad faith*—that is, the exception that bars re-prosecution *when the defendant consents to the mistrial*. JA 502 ("I believe it is bad faith, and I am going to file a jeopardy motion on this case."). In response, the court noted that its decision was "on [Tinsley's] motion for a mistrial," *id.*, but also asked, "as nice as I can," *id.*, whether Tinsley in fact consented to the mistrial for which he had moved and argued just minutes before. Tinsley took this invitation to object to the mistrial itself.

On this record and under these circumstances, Tinsley consented to the mistrial. He moved for a mistrial; he did not attempt to withdraw the motion until after it had been granted; and even his double-jeopardy arguments before the trial court were premised on government bad faith, the bar that arises only when the defendant consents to a mistrial. *Compare Earnest v. Dorsey*, 87 F.3d 1123, 1129 (10th Cir. 1996) (finding consent to a mistrial even though defendant attempted to withdraw his mistrial motions immediately after the court granted them, because he had not made an intervening motion to withdraw or clarify his original motions, he was not misled into believing the judge had decided not to grant the motions and he was given "ample opportunity prior to the declaration of mistrial to withdraw the motions and failed to do so"), *and United States v. Goldstein*, 479 F.2d 1061, 1067 (2d Cir. 1973) (finding consent when defendants had ample opportunity to rescind their mistrial motion), *with Weston v. Kernan*, 50 F.3d 633, 637 (9th Cir. 1995) (finding no consent when, prior to the court's ruling, defendant clarified that his mistrial motion was a motion for a "mistrial with prejudice"), *United States v. Crotwell*, 896 F.2d 437, 438–39 (10th Cir. 1990) (finding no consent when defendant attempted to withdraw the mistrial motion before the court granted it), *and United States ex rel. Russo v. Superior Court*, 483 F.2d 7, 17 (3d Cir. 1973) (finding no consent when the court heard the defendant's motion for mistrial on the basis of jury deadlock, decided to allow the jury to continue deliberating for another day, and then granted the motion after the defendant had interpreted the court's delay as a de facto denial of the motion). Since Tinsley consented to the mistrial, the only ground on which to bar Tinsley's re-prosecution would be prosecutorial or judicial bad faith. On this factual question, the Kentucky Supreme Court found no bad faith by the prosecutor, and the district court properly respected this finding. D. Ct. Op. at 13.

Tinsley does not challenge the finding of no bad faith, but instead argues that we are bound by the Kentucky Supreme Court's statement that Tinsley "specifically informed the court of his objection to the granting of a mistrial when the court indicated its intention to do so." *Tinsley v. Jackson*, 771 S.W.2d 331, 332 (Ky. 1989). But this isolated statement does not establish that Tinsley withdrew his motion for a mistrial before the trial court granted it. Tinsley also argues that we should not consider the portion of the trial transcript showing that Tinsley moved for the mistrial, because the government (and Tinsley for that matter) failed to include it in the joint appendix or the record before the district court. (The government included it in a motion to take judicial notice after we heard oral arguments.) But the original joint appendix (and district court record) included a transcribed statement from the trial court to Hellings stating that "I am ruling as a matter of law under [Kentucky Revised Statute §] 505.030 that it is on your motion for a mistrial, and I believe that prevents a double jeopardy argument." JA 502. The remainder of the transcript confirms only that Tinsley did move for the mistrial—as the trial court noted in the record before us and before the district court. At any rate, it is not clear how *Tinsley* could prevail on this claim without the transcript showing who did what before the state trial court on this issue.

Equally unavailing is Tinsley's claim that the government waived its argument that Tinsley consented to the mistrial. How the government could have waived this argument is far from clear. Consistent with the State's position, the state courts and the district court applied the "bad faith" test to this claim, a test that applies only when the defendant consented to the mistrial. In trying to argue that this test should not apply, Tinsley had the burden of showing that he did not consent to the mistrial. As shown above, he has not met that burden.

C.

Tinsley next claims that the trial court violated his right to a jury drawn from a fair cross section of the community when it delegated authority to the court clerk to dismiss potential jurors from the jury pool. *See Taylor v. Louisiana*, 419 U.S. 522, 530 (1975) ("Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial."). But this argument fails on the ground that Tinsley has not shown that the dismissed venire members differed in group membership from the remaining venire members. His unsupported speculation that those excluded were "deceased persons, college students, and a category perhaps best described as elderly and/or infirmed individuals determined not to be able to participate in jury service," *see* D. Ct. Op. at 6, by itself does not establish a fair-cross-section violation, much less establish that the state courts clearly erred in rejecting this claim for lack of prejudice.

Tinsley counters that because the court did not keep records about whom the court clerk dismissed, Tinsley should be relieved of his burden of establishing a fair-cross-section violation. Tinsley offers no Supreme Court authority for this proposition. And, to our knowledge, there is none. He instead invokes *Commonwealth v. Nelson*, 841 S.W.2d 628 (Ky. 1992), which—after Tinsley's 1989 conviction—discouraged delegating responsibility for excusing jurors and suggested that a challenge to such a process need not precede the examination of jurors, as usually required by Kentucky procedure, if the party could not have known of the grounds for the challenge. *Id.* at 631. But any possible burden shifting suggested by *Nelson* is premised on Kentucky procedural rules, *see id.* at 630, which do not support a federal habeas claim.

D.

Tinsley next argues that his due process rights were violated when the arresting officer testified that Tinsley requested an attorney. In responding to the prosecutor's question asking "[w]hat, if anything, did the defendant tell you about going down to the home and finding the body of the deceased, Tammy Brier?" JA 565, the officer answered, "Somewhere during that particular time he requested an attorney." *Id.* Hellings objected on the ground that the answer was non-responsive. The trial court sustained the objection and stated, "Have him respond to the question, Mr. Veal." *Id.* Moments later, the prosecutor asked whether "the defendant [made] any more statements to you other than the one you just testified about?" JA 568–69. The officer responded, "No, sometime shortly previous to his arrest he said something to the effect of maybe I should talk to an attorney." JA 569. This time, Hellings asked to approach the bench and moved for a mistrial on the ground that, by revealing Tinsley's reticence to talk without an attorney, the prosecution had violated *Doyle v. Ohio*, 426 U.S. 610 (1976). The trial court sustained the objection but did not grant a mistrial. Hellings did not ask for a limiting instruction. In sustaining the objection, the trial court's action alone may have sufficed to cure the improper answer, *Greer v. Miller*, 483 U.S. 756, 763 (1987), and may by itself have sufficed to "militate against finding a constitutional violation," *United States v. Moreno*, 185 F.3d 465, 474 (5th Cir. 1999). But in view of the fact that the two statements at issue were short and there was no evidence that they were planned, the trial court's decision to sustain the objections, especially without a request from the defense attorney for limiting instructions, suffices to establish that the Kentucky courts did not violate clearly established Supreme Court precedent in addressing this claim.

E.

Tinsley next argues that his due process rights were violated when the trial court denied his motion for a directed verdict. "[T]he applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The Kentucky

Supreme Court found that there was "ample evidence to submit to the jury" and declined to disturb the jury's verdict.   JA 146.   The test that the Kentucky Supreme Court used, *Trowel v. Commonwealth*, 550 S.W.2d 530, 533 (Ky. 1977) (whether "under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty"), is not contrary to clearly established Supreme Court precedent, *Jackson*, 443 U.S. at 324, and its application was not unreasonable in this case.   While the defense presented evidence supporting Tinsley's claim of innocence, it was not irrational for the jury to accept the prosecutor's evidence as establishing guilt beyond a reasonable doubt.

F.

Tinsley next argues that he was denied his right to be tried by indictment, and that the state trial court lacked jurisdiction to try him due to flawed grand jury proceedings.   More particularly, Tinsley contends that the grand jury testimony by a detective included hearsay and false testimony regarding crime laboratory findings when in fact the findings were not yet available.   The Kentucky Court of Appeals properly denied this claim:

> We have reviewed those portions of [the] grand jury testimony cited by Tinsley in his argument.   The only reference therein to the crime lab is when [the officer] states, in reference to Tinsley's bloody clothing, "I am taking that garment to the lab. . . ." While the testimony does include hearsay, the Kentucky Rules of Evidence do not prohibit the use of hearsay testimony in grand jury proceedings.   KRE 1101(d)(2). Finally, we have no basis for accepting Tinsley's allegation that any of [the officer's] testimony is false.

JA 163.   The district court accepted the Kentucky court's interpretation of state evidentiary rules and found that Tinsley did not raise a cognizable federal claim on the hearsay issue.   The district court also accepted the factual finding that Tinsley provided no basis for the allegation of false statements. We agree with this rationale.

G.

Tinsley next contends that his due process rights were violated when Kentucky officials sent him to federal custody to be arraigned and tried on federal firearm charges before his second trial, thereby losing jurisdiction over him.   The district court agreed with the Kentucky Court of Appeals that this fact does not supply a basis for vacating Tinsley's conviction.   D. Ct. Op. at 14.   The court noted that when Kentucky officials transferred Tinsley to federal custody, they did not release him from state custody, but merely "loaned" Tinsley to the federal authorities during his federal trial. *Id.* at 15.

Nonetheless, Tinsley contends that Kentucky's now-overturned forfeiture rule, *see Commonwealth v. Hale*, 96 S.W.3d 24 (Ky. 2003), required Kentucky to release Tinsley immediately once they transferred him to federal custody during his federal trial.   But even prior to Tinsley's first trial, the Kentucky courts had ruled that the forfeiture rule does not apply if the defendant is awaiting trial on Kentucky charges. *See Simpson v. Black*, 471 S.W.2d 739 (Ky. Ct. App. 1971).   Tinsley attempts to distinguish *Simpson* by noting that when he was transferred, his first trial (the one that ended in a mistrial) had already ended.   But we have already determined that Tinsley's second trial did not violate any double-jeopardy bar.   Even assuming that Kentucky's forfeiture rule raises a cognizable federal due process claim, then, the claim is without merit.

### H.

Tinsley, lastly, argues that the harmful effects of all of his alleged constitutional violations should be aggregated to satisfy any prejudice requirement or harmless-error analysis. But the Kentucky Court of Appeals and the district court found no merit in any of the claims, and therefore found no effects to combine. *See* D. Ct. Op. at 31. Even assuming deficient performance in failing to question certain evidence at trial and failing to hire an independent blood-spatter expert, any possible harm from these claims, even when combined, is insufficient to undermine confidence in the outcome of this verdict.

### III.

For these reasons, we affirm the district court's judgment in all respects, save whether Hellings rendered ineffective assistance by ostensibly failing to present an opening and closing argument during the penalty phase of the trial, which we remand to the district court for consideration in the first instance.